IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SHIPPITSA LIMITED,                        §
                                          §
                        Plaintiff,        §
                                          §   Civil Action No. 3:18-CV-1036-D
VS.                                       §
                                          §
ANDREW JON SLACK, et al.,                 §
                                          §
                        Defendants.       §

MEMORANDUM OPINION
AND ORDER

        In this action for trademark infringement and related claims, defendant Wolfson Berg

Limited ("Wolfson Berg") moves to dismiss the claims asserted against it by plaintiff

Shippitsa Limited ("Shippitsa") for lack of personal jurisdiction, improper venue, and failure

to state a claim on which relief can be granted.  For the reasons that follow, the court

concludes that it can exercise personal jurisdiction over Wolfson Berg, that venue is proper

in this district, and that Shippitsa has failed to state a claim as to some, but not all, of its

causes of action.  Accordingly, the court grants in part and denies in part Wolfson Berg's

motion, and grants Shippitsa leave to replead.

I

        According to Shippitsa's complaint, it manufactures a dietary supplement called

Phen375, which it sells through its website at the domain name phen375.com.  Shippitsa is

organized under the laws of the United Kingdom ("UK"), is registered in Scotland, and

maintains its headquarters in Scotland.  It owns the U.S. registered trademark for the standard

characters "PHEN375."  Compl. ¶ 10.

Shippitsa advertises Phen375 online via an "affiliate marketing network system."  *Id.*
¶ 16.  An affiliate marketing network is comprised of three types of entities: advertisers, who
sell products or services; affiliates, who operate websites that attract visitors with their
content (such as product reviews); and an affiliate marketing network company, which acts
as an intermediary between the advertisers and the affiliates.  Affiliates, through the websites
they operate, provide information about the advertisers' products.  They also provide
"affiliate links" that take users to the advertisers' own websites.  P. Resp. App. 047-48.
When a user clicks on an affiliate link and then buys a product from the advertiser, the
affiliate receives a commission on the sale.  The affiliate marketing network company tracks
visitors and coordinates commission payments among companies within the network.

In 2011 Shippitsa contracted with now-dismissed defendant MoreNiche Limited
("MoreNiche") to join MoreNiche's affiliate marketing network as an advertiser.  Shippitsa
advertised its Phen375 product through MoreNiche's network until March 2018, when the
contract between the two companies expired.  According to Shippitsa, after the contract
expired, certain affiliate websites continued to display information about Phen375.[1]  Instead
of linking to Shippitsa's phen375.com website, however, they instead linked visitors to a

---

[1]The particular websites identified in the complaint are nhscenter.com and
myphen375fatburnerreviews.com, operated by now-dismissed Doe Defendants 1 and 2.
According to the declaration of Shippitsa's lead counsel, "[a]fter filing the Complaint, [he]
personally verified over 100 websites which included content using the PHEN375 mark[.]"
P. Resp. App. 007.

webpage—mixi.mn—operated by MoreNiche. The mixi.mn webpage consists only of the following visible lines of text: "Phen375 is no longer available via this link, we will be redirecting you to an alternative in 5 seconds. If you do not want us to do that click here." Compl. ¶ 25. If a visitor waits five seconds, mixi.mn automatically "redirect[s]" the visitor, *id.* ¶ 26—that is, mixi.mn causes the visitor's web browser to connect automatically to another website, *see* P. Resp. App. 003.

At the time Shippitsa filed the instant lawsuit, mixi.mn was sending users to either of two websites operated by Wolfson Berg: phenq.com and ph375.com.[2] Wolfson Berg is a company organized under the laws of Cyprus and is headquartered there.[3] Through Wolfson Berg's websites, it sells dietary pills called PhenQ and Ph.375.[4] Like Phen375, PhenQ and Ph.375 are marketed as weight loss supplements. Shippitsa identifies a number of similarities between Wolfson Berg's websites and Shippitsa's own phen375.com website: "the home pages on the ph375.com and phenq.com websites both include a picture of a bottle of the product, blue sans serif text on a white background, and clickable 'Ingredients,' 'How

[2]Shippitsa's evidence suggests that, as of May 2018, mixi.mn has stopped redirecting visitors to Wolfson Berg's websites, and instead sends them to google.com.

[3]The complaint alleges that now-dismissed defendant Andrew Jon Slack ("Slack") is the founder and an executive of Wolfson Berg, but Wolfson Berg's director has denied this allegation via declaration. Shippitsa has offered no evidence to the contrary. There being no conflict in the evidence on this point, the court concludes for purposes of today's ruling that Slack is not a founder or executive of Wolfson Berg. *See Bullion v. Gillespie*, 895 F.2d 213, 216-17 (5th Cir. 1990).

[4]Wolfson Berg admits that it owns the websites phenq.com and ph375.com. Shippitsa's evidence indicates that the Ph.375 website is no longer accessible.

it Works,' 'Testimonials,' 'FAQ,' and 'ORDER NOW' links[.]" Compl. ¶ 22. Shippitsa alleges that Wolfson Berg uses "a color scheme, package, trade dress, and promotional and advertising materials" in connection with PhenQ and Ph.375 that are confusingly similar to those that Shippitsa uses for Phen375. *Id.*

Shippitsa sued Wolfson Berg, MoreNiche, and MoreNiche's founder Andrew Jon Slack ("Slack"),[5] asserting federal-law claims for trademark infringement, false designation of origin, trademark dilution, cybersquatting, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Shippitsa also brings Texas-law claims for tortious interference with a prospective contractual relationship, trademark dilution, and unfair competition. Wolfson Berg, MoreNiche, and Slack each filed a motion to dismiss on the grounds of lack of personal jurisdiction, improper venue, and failure to state a claim on which relief can be granted. MoreNiche and Slack also filed a joint motion for Fed. R. Civ. P. 11 sanctions against Shippitsa. The court granted MoreNiche and Slack's motions to dismiss for lack of personal jurisdiction and denied their motion for Rule 11 sanctions. *See Shippitsa Ltd. v. Slack* (*Shippitsa I*), 2019 WL 277613, at *10 (N.D. Tex. Jan. 22, 2019) (Fitzwater, J.). But the court deferred deciding Wolfson Berg's motion to dismiss, and instead ordered limited discovery and supplemental briefing on the question of personal jurisdiction.

---

[5]As indicated above, *see supra* note 1, Shippitsa also sued two John Doe defendants. Shippitsa has since dismissed its actions against both defendants without prejudice under Fed. R. Civ. P. 41(a)(1)(A)(i).

Jurisdictional discovery is now complete, and the parties have submitted their supplemental briefing. Wolfson Berg's motion to dismiss is ripe for decision.

## II

The court first considers Wolfson Berg's motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.

## A

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985); *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545 (5th Cir. 1985)). The determination whether a federal district court has *in personam* jurisdiction over a nonresident defendant is bipartite. The court first decides whether the long-arm statute of the state in which it sits confers personal jurisdiction over the defendant. If it does, the court then resolves whether the exercise of jurisdiction is consistent with due process under the United States Constitution. *See Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). Because the Texas long-arm statute extends to the limits of due process, the court need only consider whether exercising jurisdiction over the defendant would be consistent with the Due Process Clause of the Fourteenth Amendment. *See id.*; *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).

The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." To comport with due process, the defendant's conduct in connection with the forum state must be such that it "should reasonably anticipate being haled into court" in the forum state.

*Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (footnotes omitted) (first quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); then quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). To determine whether exercising jurisdiction would satisfy traditional notions of fair play and substantial justice, the court examines (1) the defendant's burden, (2) the forum state's interests, (3) the plaintiff's interests in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the states' shared interest in fundamental social policies. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 421 (5th Cir. 1993).

A defendant's contacts with the forum may support either specific or general jurisdiction over the defendant. *Mink*, 190 F.3d at 336. "For the court properly to assert specific personal jurisdiction, the defendant must have 'purposefully directed' his activities at residents of the forum, and the litigation must result from alleged injuries that 'arise out of or relate to' the defendant's activities directed at the forum." *Archer & White, Inc. v. Tishler*, 2003 WL 22456806, at *2 (N.D. Tex. Oct. 23, 2003) (Fitzwater, J.) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "General jurisdiction exists when a

defendant's contacts with the forum state are unrelated to the cause of action but are 'continuous and systematic.'" *Id.* (quoting *Mink*, 190 F.3d at 336). "[A] court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (first brackets added) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Shippitsa argues that this court has specific personal jurisdiction over Wolfson Berg.

"The district court usually resolves the jurisdictional issue without conducting a hearing." *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993) (footnote omitted).

> When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts posed by the affidavits. Therefore, in a no-hearing situation, a plaintiff satisfies his burden by presenting a prima facie case for personal jurisdiction.

*Latshaw*, 167 F.3d at 211 (footnotes omitted). "This liberal standard, however, does not require the court to credit conclusory allegations, even if they remain uncontradicted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 2000 WL 35615925, at *2 (N.D. Tex. Sept. 15, 2000) (Fitzwater, J.) (citing *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 n.16 (5th Cir. 1996)), *aff'd*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam) (affirming, *inter alia*, this conclusion). Nor is the court limited to considering the facts pleaded in the complaint. *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241

(5th Cir. 2008). Rather, "the district court may receive any combination of the recognized methods of discovery, including affidavits, interrogatories, and depositions to assist it in the jurisdictional analysis." *Tendeka, Inc. v. Glover*, 2014 WL 978308, at *3 (S.D. Tex. Mar. 12, 2014) (Rosenthal, J.) (internal quotation marks omitted).

B

Shippitsa argues that Wolfson Berg has minimum contacts with this forum on two different grounds: that Wolfson Berg has sold its PhenQ and Ph.375 products to Texas residents, and that Wolfson Berg has operated interactive websites through which it sold these products to Texas residents. Because the latter ground is sufficient to support this court's exercise of personal jurisdiction, it will focus its analysis on that ground alone.

1

When specific jurisdiction is based on online interactions via an Internet website, the Fifth Circuit is guided by the sliding scale adopted in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *See Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.*, 106 F.Supp.2d 895, 900-01 & n.10 (N.D. Tex. 2000) (Fitzwater, J.) (citing *Mink*, 190 F.3d at 336) (interpreting *Zippo*). *Zippo* requires the court to assess the level of interactivity of the defendant's website. It prescribes different outcomes to the personal jurisdiction question depending on which of following three categories the website falls into: (1) where a website is nothing more than a passive advertisement, the court must decline to exercise personal jurisdiction; (2) where a website facilitates contractual relationships and the knowing and repeated transmission of computer files over the internet,

personal jurisdiction is proper; and (3) where a website falls somewhere in between, "the exercise of jurisdiction is determined by the level of interactivity and commercial nature of the exchange of information that occurs on the [w]ebsite." *Mink*, 190 F.3d at 336 (quoting *Zippo*, 952 F. Supp. at 1124). While interactivity is a significant factor in determining purposeful conduct when personal jurisdiction is based on Internet contacts, "internet-based jurisdictional claims must continue to be evaluated on a case-by-case basis, focusing on the nature and quality of online and offline contacts to demonstrate the requisite purposeful conduct that establishes personal jurisdiction." *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 227 (5th Cir. 2012).

2

Phenq.com and ph375.com fall at least within the middle category of *Zippo*. Wolfson Berg admits that its websites permitted users to submit orders online, to chat with sales agents, and to track pending orders. This evidence is sufficient to "establish that the [w]ebsite[s] [did] more than passively exist for advertising purposes." *Autoflex Leasing-Dall. I, LLC v. Autoflex LLC*, 2017 WL 713667, at *4 (N.D. Tex. Feb. 23, 2017) (Fitzwater, J.).

Within the middle category of *Zippo*, Wolfson Berg's websites can support the exercise of personal jurisdiction because they were sufficiently interactive and facilitated the exchange of commercial information. Wolfson Berg's websites invited users to "ORDER NOW," and offered free shipping to anywhere in the world. Compl. ¶¶ 20-21. The websites also provided a "Chat" interface that allowed visitors to ask questions about Wolfson Berg's

products. And visitors could track and follow up on orders that they had already placed. This court has exercised personal jurisdiction on the basis of websites with very similar features. *See, e.g., Tempur-Pedic Int'l, Inc. v. Go Satellite Inc.*, 758 F.Supp.2d 366, 376 (N.D. Tex. 2010) (Fitzwater, C.J.) (exercising personal jurisdiction where defendant operated website through which "residents could ask questions via live chat, place orders, and continue communicating with the staff to follow up on shipping and payment"); *Am. Eyewear*, 106 F.Supp.2d at 898, 901-02 (concluding that New York-based website had sufficient contacts to support specific jurisdiction where website provided online order forms and ways to communicate with customer service). Wolfson Berg does not contest this conclusion.

Of course, merely maintaining interactive websites does not, without more, establish that Wolfson Berg has the requisite minimum contacts with Texas. "Under *Zippo* personal jurisdiction is based on *actual* Internet sales to forum residents, not the mere possibility of sales." *Springboards to Educ., Inc. v. Families in Schools*, 2017 WL 10434713, at *6 (N.D. Tex. Nov. 15, 2017) (Fitzwater, J.); *see also Shippitsa I*, 2019 WL 277613, at *5 (collecting cases). The evidence shows that Wolfson Berg, through its websites, sold its allegedly-infringing products to 559 consumers in Texas and 172 consumers in the Northern District of Texas between January 8, 2018 and April 24, 2018. Sales to Texas constituted 10% of Wolfson Berg's U.S. sales of PhenQ; 3% of its worldwide sales of PhenQ; 8.18% of its U.S. sales of Ph.375; and 4.73% of its worldwide sales of Ph.375. These sales are sufficient to create the requisite minimum contacts. *See, e.g., Tempur-Pedic*, 758 F.Supp.2d at 375

(exercising personal jurisdiction on basis of *two* admitted online sales to Texas residents); *Am. Eyewear*, 106 F.Supp.2d at 898, 901-02 (exercising personal jurisdiction over company on basis of online sales to Texas, which constituted 0.5% of defendant's total sales).

Wolfson Berg could reasonably have anticipated being haled into court in Texas to answer for its online activities. Wolfson Berg deliberately offered its PhenQ and Ph.375 products for sale to consumers all over the world, including consumers in Texas. Its websites phenq.com and ph375.com included "English (US)" as a language option and provided a U.S. telephone number for visitors to call. Compl. ¶ 22. Thus Wolfson Berg clearly targeted the U.S. market, which included Texas. *See Tempur-Pedic*, 758 F.Supp.2d at 376 ("[Defendant] cannot open itself for business to every state in the United States and then feign surprise when it receives an order from a resident of one of the states."). Wolfson Berg could have elected not to sell its products to Texas residents; instead, it sold to hundreds of Texas residents over the course of just a few months. *See id.* ("[H]ad [defendant] wanted to exclude certain jurisdictions, it was able to refuse to deal with certain customers or to turn down any orders after checking customer addresses."); *Zippo*, 952 F. Supp. at 1126-27 ("If [defendant] had not wanted to be amenable to jurisdiction in Pennsylvania, the solution would have been simple—it could have chosen not to sell its services to Pennsylvania residents."). Wolfson Berg thus purposefully availed itself of the benefits of doing business in Texas, such that it should reasonably have anticipated being haled into court there. *Cf. Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006) ("[M]ere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if

the defendant's product made its way into the forum state while still in the stream of commerce." (second alteration in original) (quoting *Ruston*, 9 F.3d at 419)).  On these facts, the court concludes that Shippitsa has made out a *prima facie* case that Wolfson Berg has minimum contacts with Texas.

The court is not persuaded by Wolfson Berg's arguments to the contrary.  Wolfson Berg cites four recent Supreme Court cases in support of its contention that this court lacks personal jurisdiction: *Bristol-Myers Squibb Co. v. Superior Court*, ___ U.S. ___, 137 S. Ct. 1773 (2017); *Walden v. Fiore*, 571 U.S. 277 (2014); *Daimler*, 571 U.S. 117; and *Goodyear*, 564 U.S. 915.  But these cases are inapposite.  *Daimler* and *Goodyear* are both *general* jurisdiction cases, whereas Shippitsa argues in the present case that the court has *specific* jurisdiction over Wolfson Berg.  *See Daimler*, 571 U.S. at 121; *Goodyear*, 564 U.S. at 918. *Walden* involved a defendant whose only connection to the forum state was his interaction in a *different* state with the plaintiffs, who were residents of the forum state.  *See Walden*, 571 U.S. at 288-89.  Shippitsa's theory of personal jurisdiction, in contrast, is based on Wolfson Berg's contacts with Texas, not on Wolfson Berg's contacts with Shippitsa—indeed, it appears to be undisputed that Shippitsa has no physical presence in Texas.  Finally, *Bristol-Meyers* merely reiterated the requirement that specific jurisdiction be based on an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State."  *Bristol-Meyers*, 137 S. Ct. at 1781 (alteration in original) (quoting *Goodyear*, 564 U.S. at 919).  For the reasons discussed below, that requirement is satisfied here.

Wolfson Berg contends that specific jurisdiction is lacking because Shippitsa's claims do not arise from Wolfson Berg's forum-related contacts. The principal case on which Wolfson Berg relies is *Withdrawal-Ease.com v. Withdrawalaid.com*, 2014 WL 12479407 (W.D. Tex. Dec. 18, 2014). In *Withdrawal-Ease* the plaintiff sued the defendant for allegedly using the plaintiff's intellectual property on the defendant's website. *See id.* at *1. The defendant's only connection to the forum state was a number of online sales to forum residents. *See id.* at *3. The court held that it lacked specific personal jurisdiction because the plaintiff's causes of action "have arisen out of or resulted from the content of Defendants' website, not from the Defendants' contacts with Texas." *Id.* In contrast, Shippitsa's claims *do* arise from Wolfson Berg's forum-related contacts. The evidence and Shippitsa's allegations, viewed in the light most favorable to Shippitsa, show that hundreds of Texas residents accessed Wolfson Berg's allegedly-infringing websites, viewed allegedly-infringing content, and were thereby induced to submit orders for Wolfson Berg's allegedly-infringing products—orders that Wolfson Berg purposefully chose to fill. *Cf. Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994) ("[A] cause of action for trademark infringement arises where the passing off occurs." (quoting *Tefal, S.A. v. Prods. Int'l Co.*, 529 F.2d 495, 496 n.1 (3d Cir. 1976))). Wolfson Berg could reasonably have foreseen being haled into a Texas court on this basis. There is thus a "constitutionally adequate nexus," *Withdrawal-Ease*, 2014 WL 12479407, at *4 (quoting *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 500 (5th Cir. 2012)), between Shippitsa's claims and Wolfson Berg's forum-related contacts.

Wolfson Berg also argues that the present case is distinguishable from other *Zippo* cases because Shippitsa—unlike the typical *Zippo* plaintiff—is not a resident of the forum state. But this is a distinction without a difference. The Supreme Court has never "required a *plaintiff* to have 'minimum contacts' with the forum State before permitting that State to assert personal jurisdiction over a nonresident defendant." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984) (emphasis added). The minimum contacts analysis instead focuses on "the relationship among the *defendant*, the forum, and the litigation." *Walden*, 571 U.S. at 284 (emphasis added) (quoting *Keeton*, 465 U.S. at 775). So long as there is a constitutionally-sufficient relationship among these three factors, the plaintiff's state of residence is immaterial. *See, e.g., Keeton*, 465 U.S. at 772, 779-80. The court concludes, for the reasons discussed, that such a relationship exists in this case.

C

The court next determines whether exercising personal jurisdiction over Wolfson Berg would comport with traditional notions of fair play and substantial justice.

Wolfson Berg must present a "compelling case" that jurisdiction is unreasonable and incompatible with "fair play and substantial justice." *Burger King*, 471 U.S. at 477-78. "It is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown." *See Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (alterations in original) (citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1547 (Fed. Cir. 1995)). Wolfson Berg has not made the required compelling case.

Wolfson Berg contends that it would suffer a substantial burden if forced to "defend

itself in a forum almost 11,000 kilometers from its home." Wolfson Berg Supp. Resp. 15. The uncontroverted evidence shows that Wolfson Berg is a Cyprus company whose employees all reside in Cyprus, and that maintains all of its records in Cyprus. Wolfson Berg asserts that it would have to incur significant costs to arrange for witnesses to travel to Texas; that it structures its affairs in accordance with Cyprus law; and that it would have to undertake an additional, expensive legal analysis during discovery to ensure compliance with the European Union's stringent General Data Protection Regulation. Turning to the other *Burger King* factors, Wolfson Berg argues that Texas has little interest in a case in which no party is a Texas resident; that the plaintiff and the judicial system have no interest in the "efficient" resolution of this controversy in Texas given that no witnesses or evidence are located in Texas; and that adjudicating this dispute in a European forum would not undercut any fundamental social policies. *See Burger King*, 471 U.S. at 477-78.

The court is sympathetic to the difficulties Wolfson Berg, a foreign entity, will face defending in this forum. It is unquestionable, however, that Texas has an interest in resolving the present controversy. "Texas has an interest in protecting its consumers from consumer confusion or deception, and plaintiff[] [is] suing based on harm to [its] goodwill and false advertising affecting the Texas market." *Tempur-Pedic*, 758 F.Supp.2d at 377. The remaining *Burger King* factors—including the potential burden on Wolfson Berg—do not add up to a "compelling case," *Burger King*, 471 U.S. at 477, that the exercise of personal jurisdiction would be unfair. It is not constitutionally unreasonable to require a company to defend in a state where the company actively sells its products. *See Luv N' Care*, 438 F.3d

- 15 -

at 474. The court therefore concludes that it can exercise personal jurisdiction over Wolfson Berg in this matter.

III

The court next considers Wolfson Berg's motion to dismiss for improper venue.

Because Wolfson Berg has challenged venue, Shippitsa has the burden of sustaining it. *See Davis v. Billick*, 2002 WL 1398560, at *7 (N.D. Tex. June 26, 2002) (Fitzwater, J.). "In the absence of an evidentiary hearing on the matter, courts will allow a plaintiff to carry the burden by establishing facts, taken as true, that establish venue." *Laserdynamics Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 390 (S.D. Tex. 2002). The uncontroverted facts contained in the plaintiff's complaint are taken as true, and any factual conflicts demonstrated in the parties' documents and affidavits will be resolved in the plaintiff's favor. *See id.* (citing *McCaskey v. Cont'l Airlines Inc.*, 133 F.Supp.2d 514, 523 (S.D. Tex. 2001)).

Shippitsa contends that this judicial district is a proper venue for its trademark infringement claim because "a substantial part of the events or omissions giving rise to the claim occurred" here. 28 U.S.C. § 1391(b)(2). "Courts addressing trademark venue consider several factors, such as 'whether the allegedly infringing labels were affixed in the district, whether confusion to consumers is likely to occur in the district, whether sales occur there, and whether the defendant actively targeted the district for advertising or other sales-related purposes.'" *Francesca's Collections, Inc. v. Medina*, 2011 WL 3925062, *1 (S.D. Tex. Sept. 7, 2011) (quoting 14D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3806.1 (3d ed. 2007)). For the reasons discussed *supra* at § II(B)(2)—i.e.,

because Wolfson Berg sold its allegedly-infringing products, via its allegedly-infringing website, to 172 district residents, and thereby caused consumer confusion within the district—the court concludes that a substantial portion of the events giving rise to Shippitsa's claim occurred in the Northern District of Texas. *Cf. Cabot Oil & Gas Corp. v. Water Cleaning Servs., LLC*, 2012 WL 2133589, at *2-3 (S.D. Tex. June 12, 2012) (concluding that venue was *improper* where defendant operated an interactive website but the evidence *did not* show that defendant sold any products to district residents); *Medina*, 2011 WL 3925062, at *2-3 (same).

The court may exercise pendent venue over the remaining claims in Shippitsa's complaint because all of Shippitsa's claims against Wolfson Berg "derive from a common nucleus of operative facts, and judicial economy is best served by adjudicating those claims in a single forum." *Elmalky v. Upchurch*, 2007 WL 944330, at *7 (N.D. Tex. Mar. 28, 2007) (Boyle, J.) (citing *Seamon v. Upham*, 563 F. Supp. 396, 398 (E.D. Tex. Feb. 14, 1983); 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1588 (2d ed. 1990)); *see also* 14D Wright & Miller, *supra*, § 3808, at 213-31 (4th ed. 2013 & Supp. 2019) (containing an in-depth discussion of pendent venue doctrine).

IV

The court next turns to Wolfson Berg's motion to dismiss for failure to state a claim on which relief can be granted.

Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive a motion to dismiss, Shippitsa must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)). Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "labels and conclusions." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And "a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

"[Rule] 9(b) applies to . . . RICO claims resting on allegations of fraud." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). "Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013)). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (quoting *Benchmark Elecs.*, 343 F.3d at 724) (internal quotation marks omitted). More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud. *Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

Because Rule 9(b) must be "read in conjunction with [Rule] 8 which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," "punctilious pleading detail" is not required. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.) (quoting *Landry v. Air Lines Pilots Ass'n Int'l AFL–CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990)) (internal quotation marks omitted). "The court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL

2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (quoting *FDIC v. Gaubert*, No. 3-90-1196-D, slip op. at 7 (N.D. Tex. Sept. 4, 1990) (Fitzwater, J.)).

B

Wolfson Berg moves to dismiss Shippitsa's civil RICO, civil RICO conspiracy, trademark dilution, unfair competition, tortious interference, false designation of origin, and cybersquatting claims.[6]

1

Under the heightened Rule 9(b) standard, Shippitsa has failed to plausibly plead a claim for a civil RICO violation or a civil RICO conspiracy.

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). "Reduced to their simplest terms, the essential elements of a RICO claim are: (1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Orthoflex, Inc. v. ThermoTek, Inc.*, 2012 WL 2864510, at *2 (N.D. Tex. July 12, 2012) (Fitzwater, C.J.) (quoting *Larrew v. Barnes*, 2002 WL 32130462, at *1 n.1 (N.D. Tex. Aug. 27, 2002) (Kaplan, J.), *rec. adopted*, 2002 WL 32130462 (N.D. Tex. Sept. 17, 2002) (Fitzwater, J.)). "Section 1961(1)(B) defines 'racketeering activity'

---

[6]Wolfson Berg does *not* seek dismissal of Shippitsa's trademark infringement claim.

according to whether it constitutes 'any act which is indictable' under several specified sections of title 18 of the United States Code, [two] of which [are] mail fraud [and wire fraud]." *TruGreen Landcare, LLC v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.) (citations omitted). "To establish a pattern of racketeering activity, [plaintiff] must allege (1) the predicate acts of racketeering activity, and (2) a pattern of such acts." *Orthoflex, Inc.*, 2012 WL 2864510, at * 2 (citing *In re Burzynski*, 989 F.2d 733, 742 (5th Cir.1993)).

To establish a *conspiracy* to violate RICO, per 18 U.S.C. § 1962(d), Shippitsa must allege the existence of an agreement. *See Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140-41 (5th Cir. 1992). "To specifically plead the agreement, [plaintiff] must plead facts that show that [defendant] and its agents, by their 'words or actions . . . objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.'" *Paul v. Aviva Life & Annuity Co.*, 2010 WL 5105925, at *6 (N.D. Tex. Dec. 14, 2010) (Boyle, J.) (quoting *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978)). Wolfson Berg argues that Shippitsa has failed to plausibly plead the existence of an agreement, an enterprise, a predicate act, or an injury.

The court agrees that Shippitsa has failed to allege a predicate act, and this failure is fatal to Shippitsa's direct civil RICO claim. The only allegedly-criminal act that Wolfson Berg *itself* committed (as opposed to other actors within the affiliate marketing network) is selling infringing products through websites that are confusingly similar to Shippitsa's

website.  Shippitsa contends that this activity constitutes wire fraud under 18 U.S.C. § 1343.[7]

But the activity described in the complaint constitutes, at most, ordinary trademark infringement; and there appears to be no precedent in the Fifth Circuit for prosecuting ordinary trademark infringement as wire fraud.  *See S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, 912 F.Supp.2d 404, 422 (E.D. La. 2012), *aff'd on other grounds*, 567 Fed. Appx. 945, 963 (5th Cir. 2014).  Indeed, a number of courts have dismissed civil RICO claims that were based on patent or trademark infringement, even where the plaintiff attempted to plead that infringement as mail or wire fraud.  *See, e.g., id.*; *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 98 F.Supp.2d 480, 491 (S.D.N.Y. 2000) (collecting cases from various jurisdictions).  These cases suggest that, as a general matter, "ordinary infringement claims cannot constitute mail or wire fraud because there is no deceptive element, which is required to establish a scheme to defraud."  *S. Snow*, 912 F.Supp.2d at 422. In other words, merely infringing a patent or trademark does not, without more, constitute a material misrepresentation or establish the requisite intent to deceive.  *See Johnson Elec.*, 98 F.Supp.2d at 489-91 (citing, *inter alia*, *Naso v. Park*, 850 F. Supp. 264, 274-75 (S.D.N.Y. 1994)).  Thus Shippitsa has failed to plausibly allege facts showing that Wolfson Berg

---

[7]The elements of wire fraud are (1) that the defendant knowingly created a scheme to defraud, (2) that the defendant acted with a specific intent to defraud, (3) that the defendant used interstate wire communications facilities for the purpose of carrying out the scheme, and (4) that the scheme to defraud employed false material representations.  *See, e.g., United States v. Smallwood*, 2011 WL 2784434, at *9 n.15 (N.D. Tex. July 15, 2011) (Fitzwater, C.J.).

committed wire fraud by selling products through ph375.com and phenq.com.[8]

As to Shippitsa's civil RICO conspiracy claim, the court holds that Shippitsa has not plausibly pleaded the existence of an agreement. Shippitsa was required to allege "facts that show that [defendant] and its agents, by their 'words or actions . . . objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.'" *Paul*, 2010 WL 5105925, at *6 (quoting *Elliott*, 571 F.2d at 903). Instead, Shippitsa conclusorily alleges that "[defendants] have conspired to violate the provisions of 18 U.S.C. § 1962(a) in violation of 18 U.S.C. § 1962(d)." Compl. ¶ 59. This vague statement does not satisfy the plausible pleading standard. The court dismisses Shippitsa's civil RICO conspiracy claim.

2

Shippitsa's complaint fails to state a claim for state or federal trademark dilution. Under both federal law and Texas law, dilution claims are only available to those who own "famous" marks. *See* 15 U.S.C. § 1125(c)(1); Tex. Bus. & Com. Code Ann. § 16.103(a) (West 2011). Shippitsa has not plausibly pleaded that its Phen375 mark is famous.

To determine whether a mark is famous under federal law, courts "consider all relevant factors, including the following":

---

[8]The court does not suggest that an act constituting trademark infringement can *never* constitute mail or wire fraud. But the pattern of infringement that Shippitsa alleges does not.

- 23 -

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

Federal law "restrict[s] dilution causes of action to those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie dolls, and the like." *Springboards to Educ., Inc. v. Scholastic Book Fairs, Inc.*, 2018 WL 1806500, at *4 (N.D. Tex. Apr. 17, 2018) (Boyle, J.) (quoting *Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin v. KST Elec., Ltd.*, 550 F.Supp.2d 657, 679 (W.D. Tex. 2008)). "Other examples of famous marks include the JUST DO IT Nike slogan, the STARBUCKS mark, the MCDONALD'S mark, and the PEPSI mark." *Id.* (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:107 (5th ed. 2017) ("McCarthy on Trademarks")). The federal dilution statute is "simply not intended to protect trademarks whose fame is at all in doubt." *KST Elec.*, 550 F.Supp.2d at 679 (quoting Barton Beebe, *A Defense of the New Federal Trademark Antidilution Law*, 16 Fordham Intell. Prop. Media & Ent. L.J. 1143, 1158 (2006)). Because the statute requires that the plaintiff's mark be "recognized by the general consuming public of the United States," 15 U.S.C. § 1125(c)(2)(A), "fame only in a limited

geographic area or niche market will not support a federal dilution claim," *Springboards*, 2018 WL 1806500, at *4.

To determine whether a mark is famous under Texas law, courts consider a similar set of factors that emphasize the reach of the mark *in Texas*:

> (1) the duration, extent, and geographic reach of the advertisement and publicity of the mark in this state, regardless of whether the mark is advertised or publicized by the owner or a third party;
>
> (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark in this state;
>
> (3) the extent of actual recognition of the mark in this state; and
>
> (4) whether the mark is registered in this state or in the United States Patent and Trademark Office.

Tex. Bus. & Com. Code Ann. § 16.103(b). The Texas-law fame analysis is therefore similar to the federal-law fame analysis, but with a different geographical focus. *See, e.g., Springboards*, 2018 WL 1806500, at *6 ("[Plaintiff's] Texas dilution claim fails for the same reason its federal dilution claim fails.").

Shippitsa's complaint fails to plausibly allege facts showing that the Phen375 mark is "a household name," *KST Elec.*, 550 F.Supp.2d at 679, either in the United States generally or in Texas. In support of its dilution claim, Shippitsa points to its allegations that

> its PHEN375 mark is registered, that it has used the mark for over ten years, that it offers its Phen375 product to consumers around the world and in this District via its phen375.com website, that it spent nearly $2.5 million on worldwide marketing and advertising in 2017, that customers in the dietary supplement market recognize the PHEN375 mark as an

> identifier of Shippitsa products, and that it utilizes a network of
> third-party affiliate marketers to drive consumers to the
> phen375.com website.

P. Resp. 16 (citations omitted). Taken together, these allegations establish—at most—that Phen375 has achieved niche fame in the dietary supplement market. But niche fame is not enough. *See Springboards*, 2018 WL 1806500, at *4-6. Shippitsa must allege facts showing that members of the general consuming public recognize its mark, either throughout the United States (for Shippitsa's federal-law claim) or throughout the state of Texas (for its state-law claim). *See id.* Shippitsa has not done so—it has not plausibly pleaded that its mark is on par, in any geographic area, with the likes of Starbucks, McDonald's, Rolex, or Apple. *See* 4 McCarthy on Trademarks § 24:107. The court therefore dismisses Shippitsa's state and federal trademark dilution claims.

3

The court now turns to Shippitsa's claim for unfair competition.

Unfair competition under Texas law is "the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Conceal City L.L.C. v. Looper Law Enf't, LLC*, 2011 WL 5557421, at *9 n.16 (N.D. Tex. Nov. 15, 2011) (Fitzwater, C.J.) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)). Unfair competition includes three causes of action: passing off or palming off, trade secret misappropriation, and common law misappropriation. *Id.* (citing *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App. 1993, writ denied)). Unfair competition

for passing off is the "use or simulation by one person of the name, symbols or devices of a business rival in such a manner as is calculated to deceive and cause the public to trade with the first when they intended to and would otherwise have traded with the second." *Id.* at *9 (quoting *McCarley v. Welch*, 170 S.W.2d 330, 332 (Tex. Civ. App. 1943, no writ)). To establish this claim, it is not necessary to prove that the conduct was intended or that actual deception resulted; "it is sufficient that such deception would naturally and probably result from the acts charged." *Id.* (quoting *McCarley*, 170 S.W.2d at 332). The elements of common law misappropriation are:

> (i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff.

*U.S. Sporting Prods.*, 865 S.W.2d at 218 (citing *Synercom Tech., Inc. v. Univ. Computing Co.*, 474 F. Supp. 37, 39 (N.D. Tex. 1979) (Higginbotham, J.)).

Wolfson Berg argues that Shippitsa's unfair competition cause of action is fatally deficient because Shippitsa does not specify the type of unfair competition claim it is bringing—i.e., whether it asserts passing off, trade secret misappropriation, or common law misappropriation. Assuming *arguendo* that this is an accurate characterization of Shippitsa's complaint, Wolfson Berg's argument nonetheless fails. A plaintiff need not state the *legal* basis for its claim so long as it plausibly alleges the *factual* basis for it. *See Johnson v. City of Shelby*, 574 U.S. 10, 10 (2014) (per curiam) ("Federal pleading rules call for 'a short and

plain statement of the claim showing that the pleader is entitled to relief'; they do not

countenance dismissal of a complaint for imperfect statement of the legal theory supporting

the claim asserted." (citation omitted) (quoting Rule 8(a)(2))); *see also* 5 Charles Alan

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1219, at 277 (3d ed. 2004 &

Supp. 2019) ("The federal rules effectively abolish the restrictive theory of the pleadings

doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's

claim for relief." (footnote omitted)).[9]  Even if Shippitsa's complaint fails to identify a

---

[9]The court is aware of Fifth Circuit precedent that, at first blush, may support a
contrary rule.  In *Seatrax, Inc. v. Sonbeck International, Inc.*, 200 F.3d 358 (5th Cir. 2000),
the Fifth Circuit affirmed the district court's decision to exclude a plaintiff's unfair
competition by misappropriation claim from the pretrial order and jury instructions.
According to the court, the amended complaint did not provide proper notice of the
misappropriation claim because it contained only a general allegation of "unfair
competition," and did not specify what subspecies of unfair competition it was alleging.  *See
id.* at 367-68.  The plaintiff expressly raised a misappropriation claim for the first time in the
pretrial order.  *See id.* at 368.  But *Seatrax* is distinguishable because it did not involve a
motion to dismiss—instead, it involved a decision made shortly before trial, when the court
has discretion to exclude new claims that would unduly prejudice or surprise a party.  *See id.*
at 367 ("[A] court does not abuse its discretion by excluding a new claim if adding the claim
unduly prejudices or surprises the opposing party.").  In that context, instructing the jury on
a claim not expressly raised in the complaint or otherwise argued by the plaintiff might cause
undue prejudice or surprise to the defendant.  *See id.* at 368 n.4 (noting that "[plaintiff's]
isolated reference to its claim of unfair competition by misappropriation during a deposition
did not provide adequate notice of its intent to present the claim at trial" (emphasis added)).

Moreover, *Seatrax* predates *Johnson*.  To the extent that the two cases conflict, this
court is obligated to follow the Supreme Court's more recent decision in *Johnson*.  The Fifth
Circuit has interpreted *Johnson* to apply broadly to legal theories other than § 1983 claims
like the one at issue in *Johnson. See, e.g., Shaikh v. Tex. A&M Univ. Coll. of Med.*, 739 Fed.
Appx. 215, 221 n.7 (5th Cir. 2018) (per curiam) (applying *Johnson* to claim raised under
Rehabilitation Act); *Smith v. Barrett Daffin Frappier Turner & Engel, L.L.P.*, 735 Fed.
Appx. 848, 854 (5th Cir. 2018) (per curiam) (applying *Johnson* to Fair Debt Collection
Practices Act claim).  The court sees no reason why the rationale of *Johnson* would not apply

- 28 -

specific legal theory, the court cannot dismiss it on that ground.[10]

4

Shippitsa has also sufficiently pleaded a claim for tortious interference with a prospective contractual relationship.

Under Texas law, to establish its claim for tortious interference with a prospective contractual relationship, Shippitsa must show:

> (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference.

*Cooper v. Harvey*, 108 F.Supp.3d 463, 471 (N.D. Tex. 2015) (Boyle, J.) (quoting *Mary Kay, Inc. v. Weber*, 601 F.Supp.2d 839, 863 (N.D. Tex. 2009) (Fish, J.)); *see also Staton Holdings, Inc. v. Russell Athletic, Inc.*, 2009 WL 4016117, at *2 (N.D. Tex. Nov. 20, 2009) (Fitzwater, C.J.) (enumerating these same elements). "Independently tortious" means conduct that would violate some other recognized tort duty "that is already recognized to be wrongful under the common law or by statute." *Staton*, 2009 WL 4016117, at *2 (quoting *Wal-Mart*

---

to a Texas unfair competition claim.

[10]Wolfson Berg does not properly argue that Shippitsa's *factual* allegations are insufficient to state claim. Instead, Wolfson Berg makes the conclusory assertion that Shippitsa has not pleaded sufficient facts to support any unfair competition claim. Such a threadbare argument does not support dismissal of Shippitsa's claim.

*Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001)).

Shippitsa's allegations focus on the consumers who clicked on an advertisement for Phen375 on an affiliate website and were then redirected to one of Wolfson Berg's websites. At the motion to dismiss stage, the court credits Shippitsa's plausible assertion that such consumers exist. Shippitsa had a reasonable probability of entering into a business relationship with these *specific* consumers, and Wolfson Berg's independently-tortious act of trademark infringement prevented such a relationship from forming. *See Univ. Loft Co. v. Blue Furniture Sols., LLC*, 2017 WL 876312, at *5 (W.D. Tex. Mar. 3, 2017) (acknowledging that trademark infringement is an independently-tortious action for purposes of a tortious interference claim), *rec. adopted*, No. 1:15-CV-0826-LY (W.D. Tex. Mar. 23, 2017). It is reasonable to infer from Shippitsa's allegations that Wolfson Berg knew that, by imitating Shippitsa's mark and trade dress, Wolfson Berg would prevent an otherwise-likely business relationship from forming. And Shippitsa has alleged that it was harmed by this interference. This is sufficient to state a claim on which relief can be granted.

5

Wolfson Berg contends that Shippitsa has failed to state a claim for false designation of origin under 15 U.S.C. § 1125(a)(1)[11] because Shippitsa does not allege any particular

---

[11]15 U.S.C. § 1125(a)(1):

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading

"false statement" by Wolfson Berg.  Mot. Dism. 20.

Shippitsa's claim for false designation of origin tracks the language of § 1125(a)(1)(A), which does *not* have as an element that the defendant made a false statement.

> To prevail under § 1125(a)(1), [plaintiff] need not present evidence of a "false statement."  Section 1125(a)(1) is broader in scope than [15 U.S.C.] § 1114(1) [(governing trademark infringement)], such that a plaintiff can prevail by showing use in commerce of "*any word, term, name, symbol, or device, or any combination* thereof" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."

*GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 729-30 (N.D. Tex. 2010)

---

description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(Fitzwater, C.J.) (footnote and citation omitted).[12] Thus the complaint need only allege facts showing that Wolfson Berg used, in commerce, a combination of words and symbols that was likely to cause confusion regarding the origin of Wolfson Berg's products, and that Shippitsa was injured thereby. *See id.* Wolfson Berg does not argue that the complaint is deficient in this respect.

6

Wolfson Berg maintains that Shippitsa's claim for cybersquatting fails because Shippitsa has not alleged bad faith.

15 U.S.C. § 1125(d)(1)(A) provides:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person:

---

[12]In contrast, to prevail under § 1125(a)(1)(B), Shippitsa would have to establish:

> (1) A false or misleading statement of fact about a product;

> (2) Such statement either deceived or had the capacity to deceive a substantial segment of potential consumers;

> (3) The deception was material, in that it is likely to influence the consumer's purchasing decision;

> (4) The product is in interstate commerce; and

> (5) The plaintiff has been or is likely to be injured as a result of the statement at issue.

*GoForIt Entm't*, 750 F.Supp.2d at 732 n.15 (citing *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002))

> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that—
>
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or,]
>
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark[.]

*Id.* To satisfy the bad faith prong at the motion to dismiss stage, Shippitsa need only allege facts that plausibly "creat[e] an inference that [defendant] intended to profit from the misuse of" its mark. *Transamerica Corp. v. Moniker Online Servs., LLC*, 672 F.Supp.2d 1353, 1367 (S.D. Fla. 2009). As one court has observed:

> [b]ecause defendants easily can conjure up a "legitimate" use for a domain name that incorporates a trademark, plaintiffs frequently will find it difficult, if not impossible, to obtain evidence probative of "bad faith intent" without court sanctioned discovery. Indeed, obtaining information relevant to almost all of the bad faith factors set forth in the statute requires direct testimony from the defendant. Accordingly, the court concludes that, at least where facts showing a prima facie case of "intent to profit" have been alleged, the element of bad faith generally will not come into play until the summary judgment stage.

*Ford Motor Co. v. GreatDomains.com, Inc.*, 177 F.Supp.2d 635, 643 (E.D. Mich. 2001).

Here, Shippitsa has alleged that Wolfson Berg has no bona fide intellectual property interest in the ph375.com domain name, has no legitimate prior use of that domain name, and solely uses the domain name to divert business from Shippitsa's phen375.com website so that

- 33 -

it may profit from Shippitsa's goodwill. The allegations in the complaint also plausibly show that the ph375.com website is confusingly similar to Shippitsa's website and has a commercial purpose. These facts, accepted as true, permit the inference that Wolfson Berg registered and used its ph375.com domain name with a bad-faith intent to profit from Shippitsa's Phen375 mark. The court therefore declines to dismiss Shippitsa's cybersquatting claim.

V

Although the court is dismissing some of Shippitsa's claims, it also grants Shippitsa leave to replead. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)). Plaintiffs are often able to state plausible claims for relief when amending after a motion to dismiss has been granted. *See, e.g., Reneker v. Offill*, 2010 WL 1541350, at *2, *7 (N.D. Tex. Apr. 19, 2010) (Fitzwater, C.J.) (concluding, after twice granting motions to dismiss, that plaintiff's second amended complaint stated claim on which relief could be granted). Accordingly, the court grants Shippitsa 28 days from the date this memorandum opinion and order is filed to file an amended complaint.

* * *

For the foregoing reasons, the court grants in part and denies in part Wolfson Berg's

motion to dismiss, and grants Shippitsa leave to replead.

**SO ORDERED**.

July 23, 2019.

SIDNEY A. FITZWATER
SENIOR JUDGE